UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____
                                 :
ICI UNIQEMA, INC.                  :
                                 :
                                 :
       Plaintiff,            :           Civil Action No. 06-2943 (JAP)
                                 :
                    v.           :           **OPINION**
                                 :
KOBO PRODUCTS, INC.,      :
                                 :
                                 :
       Defendant.         :
_____:

PISANO, District Judge.

Presently before the Court in this patent infringement action is the parties' request for claim construction.  Plaintiff ICI Uniqema, Inc. ("ICI" or "Plaintiff") asserts in this matter that the sunscreen products of Defendant Kobo Products, Inc. ("Kobo" or "Defendant") infringe on its patents, United States Patent Nos. 5,599,529 (the "'529 patent"), entitled "Dispersions" 5,366,660 (the "'660 patent") and, also entitled "Dispersions."[1]  The patents involve dispersions of titanium dioxide ('529 patent) and zinc oxide ('660 patent) that are used in the manufacturing of sunscreens.

The parties have filed a Joint Claim Construction Statement identifying agreed upon claim term constructions along with disputed claim terms and proposed constructions for the

_____

[1]The complaint also alleges infringement of 5,068,056 (the "'056 patent") entitled "Aqueous Dispersions of Acicular Titanium Dioxide," which is not at issue at this time.

disputed terms.  At oral argument, the parties further clarified and narrowed the number of

terms in dispute.  Each party has fully briefed the issue of the proper construction of the

disputed claim terms.  The Court, having carefully considered the submissions of the parties

and the arguments of counsel at the *Markman* hearing, addresses the proper construction of

the disputed claim terms below.

## I.  Standards for Claim Construction

In order to prevail in a patent infringement suit, a plaintiff must establish that the

patent claim "covers the alleged infringer's product or process."  *Markman v. Westview

Instrs., Inc*., 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).  Consequently, the first

step in an infringement analysis involves determining the meaning and the scope of the claims

of the patent.  *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 988 (Fed. Cir.

1995).  Claim construction is a matter of law, *Markman v. Westview Instrs., Inc*., 52 F.3d 967,

979 (Fed. Cir. 1995) *aff'd* 517 U.S. 370 (1996), therefore, it is "[t]he duty of the trial judge . . .

to determine the meaning of the claims at issue."  *Exxon Chem. Patents, Inc. v. Lubrizoil

Corp.*, 64 F.3d 1553, 1555 (Fed. Cir. 1995).

In *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005), the Federal Circuit

emphasized that "[i]t is a bedrock principle of patent law that the claims of a patent define the

invention to which the patentee is entitled the right to exclude."  415 F.3d 1312 (internal

quotations omitted) (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir.

1996) ("we look to the words of the claims themselves . . . to define the scope of the patented

invention"); *Markman*, 52 F.3d at 980 ("The written description part of the specification itself

does not delimit the right to exclude.  That is the function and purpose of claims.").

Generally, the words of a claim are given their "ordinary and customary meaning," which is

defined as "the meaning that the term would have to a person of ordinary skill in the art in

question at the time of the invention."  *Id.* at 1312-13 (citations omitted).  In this regard, the

Federal Circuit has noted that

> It is the person of ordinary skill in the field of the invention through whose
> eyes the claims are construed. Such person is deemed to read the words used in
> the patent documents with an understanding of their meaning in the field, and
> to have knowledge of any special meaning and usage in the field. The
> inventor's words that are used to describe the invention--the inventor's
> lexicography--must be understood and interpreted by the court as they would
> be understood and interpreted by a person in that field of technology. Thus the
> court starts the decisionmaking process by reviewing the same resources as
> would that person, viz., the patent specification and the prosecution history.

 *Id.* (quoting *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477
(Fed.Cir.1998)).

       In the process of determining the meaning of a claim as understood by a person skilled

in the art, a court may look to various sources from which the proper meaning may be

discerned.  These sources include "the words of the claims themselves, the remainder of the

specification, the prosecution history,[2] and extrinsic evidence concerning relevant scientific

principles, the meaning of technical terms, and the state of the art."  *Id.* at 1314.  While a court

is permitted to turn to extrinsic evidence, such evidence is generally of less significance and

less value in the claim construction process.  *Id.* at 1317.  Extrinsic evidence would include

evidence that is outside the patent and prosecution history, and may include expert testimony,

---

       [2]Along with the specification, the prosecution history is "intrinsic evidence" of the
meaning of the claims, because it "provides evidence of how the [United States Patent &
Trademark Office] and the inventor understood the patent."  *Phillips*, 415 F.3d at 1317.

dictionaries and treatises. *Id.* The Federal Circuit has noted that caution must be exercised in the use of extrinsic evidence, as this type of evidence may suffer from inherent flaws affecting its reliability in the claim construction analysis. *Id.* at 1319 ("We have viewed extrinsic evidence in general as less reliable than the patent and its prosecution history in determining how to read claim terms."). While "extrinsic evidence may be useful to the court, . . . it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.*

## II.  The Disputed Claim Terms

The parties have identified several terms from the claims of the '529 and '660 patents that are in dispute.  The Court will address each of these in turn.

1.  an "oil"

This disputed term appears in Claims 1 and 22 of the '529 patent, and in claims 1 and 26 of the '660 patent.  The parties dispute the meaning of this term for the same basic reasons in each patent.  Plaintiff argues that the term should be broadly construed, and offers the following proposed construction: "a slippery or viscous liquid or liquifiable substance that is substantially immiscible in water, including any such substance that would find value in a cosmetic preparation."  Joint Claim Chart[3] ("Chart") at 2.  Plaintiff bases its construction on

_____

[3]This chart is attached as Exhibit 1 to the Certification of James Calve (filed July 12, 2007), and is the chart that counsel referred the Court to at *Markman* hearing in December 2008.  Tr. 90:20-23; 91:2-4.  The Court notes that this chart differs from the claim chart that was submitted to the Court on April 11, 2008, even thought this later-filed claim chart was described in an accompanying letter as the "claim chart finalized by the parties in June of 2007."  Based on counsel's representation (without objection) that the chart attached to the Calve certification is "the claim chart," Tr. 91:4, the Court shall use the proposed constructions in the claim chart accompanying the Calve certification with respect to the

the non-limiting language in the patents' specifications, each of which indicate that the oil

referred to can be "any oil" but "usually will be an oil which finds value in a cosmetic

preparation." '529 patent, col. 4, lines 1-3; '660 patent, col. 3, lines 13-15.  The specifications

further state that such oils "usually" are vegetable oils, and they list "typical examples" of the

same. '529 patent, col. 4, lines 3-11; '660 patent, col. 3, lines 15-22.  Citing the dictionary

(Dictionary.com and the American Heritage Dictionary) Plaintiff argues that "oil" should be

defined more in terms of its functional qualities rather than the material of which it is

comprised.  Under Plaintiff's proposed construction, the term "oil" would include silicone

oils, esters and alcohols.

Defendant argues for a more narrow construction, and contends that the term "oil" as

used in the patents should be construed as

> vegetable oils, sunflower oil, caster oil.  This term is limited to materials which
> are greasy, sticky and viscous liquid substances that are non-volatile and
> substantially immiscible in water and comprise at least one carbon chain.  The
> term "oil" does not include metal based fluids, such as silicon based materials,
> such as silicone fluids, for example, cyclotetrasiloxane, cyclopentasiloxane and
> other cyclomethicones.

Chart at 2-3.  In essence, Kobo is arguing that the term "oil" should be limited to those

materials identified in the patents' specifications to the exclusion of other materials.  In

support of its position, Kobo also refers to extrinsic evidence such as the definition of "oil" in

the International Cosmetic Ingredient Dictionary and Handbook (11th ed., 2006)

("Dictionary"), which limits the term to "triglicerides of plant or animal origin" and the

Handbook of Chemistry and Physics, which lists as "oils" only materials of animal or plant

_____

instant decision.

origins.  Kobo also relies upon an affidavit from Eric Abrutyn, a scientist in the cosmetic industry, who states  "the term 'oil' has never been considered applicable to mono or diester fluids, siloxane based chemistry, nitrogen based chemistry, or low molecular weight hydrocarbons such as isododecane."  Abrutyn Affidavit ¶ 36.

In response to the extrinsic evidence cited by Kobo, Plaintiff points to other extrinsic evidence that Plaintiff argues establishes that persons skilled in making cosmetics and sunscreens would readily understand that the term "oil" covers a broad range of cosmetic oils that includes vegetable oils, silicone oils, esters, and alcohols.  Pl. Resp. at 10.  Plaintiff refers to a number of articles from trade publications as well as various definitions from industry reference materials that discuss the use of silicones, alcohols, esters, and others as "oils" that are used in cosmetic formulations.  *See* Certification of James Calve ("Calve Cert.")., Exs. 10-16.

Turning first to the patent itself, the Court notes that the plain language of the specifications of the patents is clear that the specific oils referenced therein are provided as examples and not limitations.  *See, e.g.*, '660 patent, col. 3, lines 12-16 ("The oil can be any oil . . . but usually will be an oil that finds value in a cosmetic preparation . . . [which] oils are usually vegetable oils."); '529 patent, col. 4, lines 1-4 (same).  As such, it would appear that acceptable oils are not necessarily limited to materials that are of plant or animal origin. Indeed, nothing in the specification or the patent history expressly excludes, for example, "metal based fluids, such as silicon based materials, such as silicone fluids, for example, cyclotetrasiloxane, cyclopentasiloxane and other cyclomethicones," as does Kobo's proposed

6

claim construction.

Additionally, to the extent it is necessary to consider extrinsic evidence, the Court finds the extrinsic evidence relied upon by the Plaintiff to be more consistent with the intrinsic evidence, as the language of the patent itself dictates that the term "oil" be construed broadly. *Phillips*, 415 F.3d at 1319 ("extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence."). Consequently, the Court shall construe "oil" consistent with Plaintiff's proposed construction to mean "a slippery or viscous liquid or liquifiable substance that is substantially immiscible in water, including any such substance that would find value in a cosmetic preparation."

2. "particles of titanium dioxide"

Claims 1 and 7-10 contain this term.[4]  Plaintiff proposes that this term be construed broadly as "particles that include titanium and oxygen."  Chart at 18.  Plaintiff argues that this definition is plain on the face of the claim.  In its briefing, Plaintiff further refines its proposed construction and explains that the chemical nomenclature of the referenced particles is $TiO_2$, and that the "particles are not limited solely to particles containing titanium and oxygen *per se* but may additionally include other materials such as coatings."  Pl. Brf. at 19.

In support of its proposed construction, Plaintiff notes that the specification expressly states that the "titanium dioxide particles to be used to form the dispersions . . . may be

---

[4]  Claim 22 contains a similar term, "particulate titanium dioxide," which the parties treat in their briefing as being subject to the same construction as "particles of titanium dioxide."

7

uncoated or coated as is desired." '529 patent, col. 1, lines 61-65.  The specification then

discloses several exemplary coatings.  *See* col. 1, lines 65-67.  The specification further notes

that the "particulate material may carry a coating of one or more organic materials" and

follows with several exemplary organic coatings.  Id., col 2, lines 21-25.

Defendant's proposed construction of the disputed phrase is much more narrow than

Plaintiff's construction.  Defendant argues that the proper construction limits the particles to

those that are "hydrophilic," as opposed to being "hydrophobic."  A "hydrophillic" particle is

one that is attracted to and thus easily mixes with water (and, conversely, is more difficult to

mix with oil), while a "hydrophobic" particle resists mixing with water and is generally more

attracted to other hydrophobic materials such as oil.  According to Defendant, the proper

construction of phrase "particles of titanium dioxide" is as follows: "Hydrophilic particles

consisting only of titanium dioxide whose chemical nomenclature is $TiO_2$, exclusive of any

coating. '[P]articles of titanium dioxide' does not include hydrophobically-treated titanium

dioxide."  Chart 18-19.

In support of its proposed construction, Defendant relies upon the affidavit of its

expert, Eric Abrutyn, who explains that the titanium dioxide particles referenced in the '529

patent are inherently hydrophyilic and remain so unless they are put through a hydrophobizing

process to make them hydrophobic.  Abrutyn Aff. ¶ 13.  According to Abrutyn, the '529

patent only mentions hydrophilic pigments and hydrophilic coatings for the particles.  Abrutyn

Aff.  ¶ 18-20. As such, Defendant argues that one skilled in the art would have viewed

Plaintiff's patent application as directed to the "trick" of loading hydrophilic pigments in oil.

*Id.* ¶ 21.  Consequently, Defendant argues that the claims of the '529 patent would not have been seen as being directed to hydrophobized particles of titanium dioxide.

The intrinsic evidence, however, does not support Defendant's assertions.  As an initial matter, it does not support Kobo's claim that the invention of the '529 patent is the "trick" of dispersing hydrophilic particles in oil.  As Plaintiff points out, the applicant defined the invention as follows:

> The subject invention is an oil dispersion comprising three essential ingredients: an oil, titanium dioxide particles of a particular size, and an organic dispersing agent for the titanium dioxide.  The dispersion as claimed possesses two characterizing features which are (a) the solids content is greater than 40% by weight, and (b) it is substantially transparent to visible light and substantially absorbent to UV light, the latter being defined by reference to a minimal value for the maximum extinction coefficient.

Kobo Ex. D at 109.  This description is consistent with the specification and claims.  Importantly, the claims themselves do not expressly limit the particles to those that are hydrophilic, and the specification does not mention that the invention is directed to dispersing only hydrophilic particles in an oil carrier.  Rather, the claims and specification are clear that the invention relates to dispersions of titanium dioxide comprised of an oil, particles of titanium dioxide having an average size from 0.01 to 0.15 micron and a dispersing agent.  '529 patent, col 1, lines 6-8.  The dispersion has a solids content that is greater than 40% by weight, and the above combination of ingredients results in a dispersion with certain functional benefits, including being substantially transparent to visible light and substantially absorbent to UV light.  Id., col. 1, lines 9-15.

Claim 22 is directed to a method of making this dispersion.  The claimed dispersion is

prepared by milling the titanium dioxide with a particulate grinding medium along with the oil and dispersing agent.  Milling continues until the titanium dioxide particles have an average size of 0.01 to 0.15 micron and the dispersion has obtained a maximum extinction coefficient of at least 40 liters per gram.  The focus of the invention is on resulting functional properties with respect to visible and UV light, not solving the problems of putting a hydrophilic pigment into oil.

Defendant also claims that limiting the construction of the disputed term to hydrophilic particles is required because the '529 patent applicant expressly disclaimed hydrophobic particles.  Among others, Defendant cites *Rhodia Chemie v PPG Industries Inc.*, 402 F.3d 1371 (Fed. Cir. 2005), in which the Federal Circuit affirmed the construction of a claim covering "silicia particulates" to include the patentee's process for producing the particulates.  The court found the limitation appropriate because, during patent prosecution, the patentee distinguished "both its product and process claims from [the prior art] and did so by focusing on the necessity of using [its process] to obtain the claimed product."  *Chimie*, 402 F.3d at 1384.  In particular, the patentee distinguished a certain prior art reference because that reference did not use a particular step found in the patentee's process.  Therefore, according to the patentee, the prior art process was not be capable of "ultimately providing a homogeneous and solid particulate product" as the claims required.  *Id.* at 1384-85.

Case law is clear that statements made during prosecution may affect the scope of the claims.  *See, e.g., Abbott Laboratories v. Sandoz, Inc.*, 566 F.3d 1282, 1289 (Fed. Cir. 2009) (statements during prosecution may disavow claim scope).  Specifically, "a patentee may limit

the meaning of a claim term by making a clear and unmistakable disavowal of scope during prosecution." *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008) (quoting *Purdue Pharma L.P. v. Endo Pharms., Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006). Indeed, "the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317. However, due to "the inherent ambiguities of prosecution history, the doctrine of prosecution disclaimer only applies to unambiguous disavowals." *Dell, Inc.*, 519 F.3d at 1375.

In the present case, the Court finds that Kobo has not identified any such "clear and unmistakable" disclaimer in the prosecution history. In response to the examiner's first rejection, the applicant undertook to distinguish the prior art upon which the rejection was based. Kobo Ex. D. at 109. The applicant explained that each prior art reference was lacking one or more of the claimed ingredients and/or functional properties of the current invention. Similarly, in responding to a later rejection, the applicant stated that the invention was distinguishable from the cited prior art "based on composition , and these references alone or together do not suggest a dispersion comprising the three ingredients of the Applicant's invention will possess the characterizing features taught."

It is true as Kobo states, that in response to this second rejection the applicant discussed, for example, the hydrophobizing treatment taught by the Shiseido (I), JP 58043912, and Shiseido (III), JP 58062106. Nevertheless, the applicant distinguished this prior art not

based upon the presence or absence of any coating that rendered the particles hydrophobic, but rather based upon the claimed ingredients, most notably the dispersing agent.  Indeed, this is demonstrated in the prosecution history by the Declaration of Jennifer Lindsay Robb, who conducted a number of experiments to show the examiner that, because it lacked a dispersing agent, the prior art did not achieve the claimed solids content, UV absorbency or visible light transparency.  Robb's experiments showed that the invention of the '529 patent worked with both hydrophobically-coated and hydrophillically-coated particles, as well as uncoated particles.

In sum, the selective quotations from the prosecution history cited by Kobo, when read in context and considered with the prosecution history as a whole, fail to establish an unambiguous disclaimer so as to require "particles of titanium dioxide" to be limited to solely hydrophilic particles.  Consequently, the Court shall construe the phrase consistent with Plaintiff's proposed construction.

## 3.  "particles of zinc oxide"

Claims 1, 4, 6, 16, 17 and 26[5] of the '660 patent contain this term.  Plaintiff's proposed construction defines this term as "particles that include zinc and oxygen having the chemical nomenclature ZnO that may additionally include lesser amounts of other materials or impurities."  Chart at 3.  Plaintiff argues that the meaning of this term is plain on its face.  As with the similar phrase found in the titanium dioxide patent, Plaintiff argues that the term is not limited to particles containing solely zinc oxide or otherwise limited to only hydrophilic

_____

[5]Claim 26 contains the term "particulate zinc oxide."

12

particles.  Pl. Brf. at 32 (citing '660 patent, col. 2, lines 5-7 ("The particles to be used to form the dispersions of the present invention may be uncoated or coated as desired.")).

Kobo, similar to its position with respect to the '529 patent, argues that the term should be construed as "[h]ydrophilic particles consisting only of the compound zinc oxide whose chemical nomenclature is ZnO.  Particles of zinc oxide may additionally include trace amounts of impurities as are normally found in commercially available microfine titanium dioxide [sic] products."  Chart at 3.  Kobo argues that because the wording used to claim the particles in the '660 patent is identical to the wording '529 patent (and, Kobo argues, the '529 patent was intended to cover only hydrophilic particles), it follows that the '660 patent covers only hydrophilic particles.  However, as set forth above, the Court rejects Kobo's assertion that the '529 patent is limited to hydrophilic particles.

Kobo's remaining arguments regarding the construction of "particles of zinc oxide" are similar to many of those Kobo asserted with respect to the phrase "particles of titanium dioxide" in the '529 patent.  As with the '529 patent, the Court finds that Kobo has not established that the term "particles" in the '660 patent excludes those that are hydrophobic.  Consequently, the Court shall construe "particles of zinc oxide" to mean "particles that include zinc and oxygen having the chemical nomenclature ZnO that may additionally include lesser amounts of other materials or impurities."

4.  "an organic dispersing agent"

This disputed term appears in Claims 1 and 22 of the '529 patent and in claims 1 and 26 of the '660 patent.  The parties dispute the meaning of this term for the same basic reasons

in each patent.  According to Plaintiff, this term should be construed to mean "any agent that assists or promotes the dispersion of solid particles in oil."  Chart at 3, 19.  In support of its position, Plaintiff points to the specifications of the patent and notes that the specifications do not limit the organic dispersing agents to any particular compound or class of compounds. Indeed, the specifications support a broad construction of the term, stating that "[m]any types of organic dispersing agents have been developed and are available for use in promoting the dispersion of particles in oily media."  '660 patent, col. 3, lines 45-48; '529 patent, col . 4, lines 34-37.  Furthermore, the specification describes"organic dispersing agent" in functional terms as "promot[ing] the dispersion of the particulate zinc oxide [or titanium dioxide] in the chosen oil." '660 patent, col. 3, lines 44-45; '529 patent, col. 4, lines 33-34.

Defendant, on the other hand, argues for an alternate construction.  According to Kobo, when properly construed, the term "organic dispersing agent" means

> an organic surface active reagent which, when added to a mixture of a particular grade and size of zinc oxide [or titanium dioxide] in a dispersion mill, and a particular oil in said dispersion mill with said particular zinc oxide [or titanium dioxide] has the effect of significantly increasing the amount of zinc oxide  [or titanium dioxide] in the dispersion and causes particles to disperse.  This is done by promoting the dispersion of the zinc oxide  [or titanium dioxide] in the oil.  "Organic dispersing agent for said particles" does not broadly include all materials which could be milled with particles in the desired media, whether, for example, exerting mechanical, molecular, or other forces on the particles to be dispersed or stabilizing a dispersion or affecting its viscosity.
>
> It does not include any emulsifier, or surfactant which may be active [as a dispersing agent, as defined above, but only][6] in another system.

---

[6]The bracketed language appears only in Kobo's proposed construction of the term in the '660 patent, but not the '529 patent.

Chart at 3-4, 19-20.  In its briefing, Kobo argues that the phrase, because it contains the word "organic," should be limited to materials having a carbon-carbon bond and which in a particular system have an appreciable effect as dispersing agents when added to other ingredients.  *See* Abrutyn Affidavit, ¶¶ 40, 41.  It appears, therefore, that an essential dispute between the two parties' constructions is whether the term encompasses silicone-based fluids.  Kobo has provided an affidavit from its expert stating that the term "organic" in the late 1980's and early 1990's "was generally limited to carbon based molecules."  Abrutyn Affidavit ¶ 40.  However, Plaintiff points to several texts, both pre- and post the referenced time period, which show that silicone-based materials could be considered "organic" compounds.  *See* Calve Cert. Ex. 43, 44 and 45.  Indeed, Plaintiff notes that Kobo's own patent application with respect to "Organosilicon Treated Cosmetic Powders" discloses examples of such compounds.  The Court, therefore, finds that because a broader construction is more consistent with the intrinsic evidence, the proper construction of the disputed term does not exclude silicone-based fluids.

Accordingly, the Court shall construe the term "an organic dispersing agent" to mean "any agent that assists or promotes the dispersion of solid particles in oil."

5.  "substantially transparent to visible light"

This term appears in claim 1 of the '529 and '660 patents.  According to the Chart that was submitted with the claim construction briefing, this claim term is undisputed.  However, at the *Markman* hearing the parties indicated that, in fact, the construction of this phrase is disputed.  The parties dispute the construction of the term for essentially the same reason in

each patent.  Plaintiff's proffered construction is as follows: "light in the visible range of the spectrum can transmit through the dispersion when applied in use."  Chart at 5, 21.  Kobo's proposed construction is fairly similar: "light in the visible range of the spectrum substantially passes through a sample of the dispersion."  Chart at 5.[7]  The difference between the two constructions boils down to whether the dispersion must be substantially transparent when the product is in use (*e.g.*, when applied to the skin as a sunscreen) or substantially transparent when it is, for example, in a jar.

The Court finds that, when read in light of the specification, the phrase "substantially transparent to visible light" should be construed consistent with Plaintiff's proffered construction.  The specification notes that the "products of the present invention have the ability to transmit visible light but are partially or completely impermeable to UV light."  '660 patent, col. 2, lines 46-48.  The specification goes on to explain that "[t]his means that the products can find use in a variety of applications wherein it is important to maintain transparency to visible light while substantially preventing transmission of UV light to a surface."  *Id.*, col. 2, lines 48-52.  Examples given include "[c]osmetics, sun-creams, plastic films and wood coating and other coating compositions."  *Id.*, col. 2, lines 52-54.  It is clear that the transparency during use, not necessarily transparency in the jar, is a significant feature the invention.

Indeed, Defendant's own briefing supports the Court's conclusion.  In the section of its

---

[7]Kobo offers this construction only for the term as it appears in the '660 patent.  The Chart does not contain a proposed construction by Kobo for this term in the '529 patent.  Chart at 21.

opening claim construction brief that is titled "Background of the Technology," Kobo notes that modern sunscreen dispersions have the characteristic of being "transparent to visible light, and thus invisible on the skin." Def. Brf. at 4. Kobo goes on to explain that "[t]ransparent to visible light means that *when the sunscreen is applied to the skin*, it appears clear and thus does not whiten the skin." *Id.* at 5 (emphasis added). In describing the development of smaller and more transparent grades of titanium dioxide and zinc oxide used in sunscreens, Kobo notes that "these smaller sunscreen pigments are transparent to visible light, which means that *when they are applied to the skin*, they appear to be transparent to the human eye and thus do not alter the appearance of the skin." *Id.* (emphasis added).

Consequently, the Court shall construe the phrase "substantially transparent to visible light" in both patents to mean "light in the visible range of the spectrum can transmit through the dispersion when applied in use."

## III.  Conclusion

For the reasons set forth above, the terms at issue will be construed as indicated. An appropriate Order shall accompany this Opinion.

/s/ JOEL A. PISANO
United States District Judge

Dated: August 13, 2009